IRVING EHRENHAUS, On Behalf of Himself and All Others Similarly Situated, Plaintiff-Appellee v. JOHN D. BAKER, II, PETER C. BROWNING, JOHN T. CASTEEN, III, JERRY GITT, WILLIAM H. GOODWIN, JR., MARYELLEN C. HERRINGER, ROBERT A. INGRAM, DONALD M. JAMES, MACKEY J. McDONALD, JOSEPH NEUBAUER, TIMOTHY D. PROCTOR, ERNEST S. RADY, VAN I. RICHEY, RUTH G. SHAW, LANTY L. SMITH, DONA DAVIS YOUNG, WACHOVIA CORPORATION and WELLS FARGO & COMPANY, Defendants-Appellees v. NORWOOD ROBINSON and JOHN H. LOUGHRIDGE, JR., Objectors-Appellants

No. COA10-1034

(Filed 4 October 2011)

**1. Class Actions—appeal of prior injunction denial—no authority**

The Court of Appeals declined to consider the question of whether objector-appellants in a class action could appeal the denial of a preliminary injunction when that denial occurred before they became involved in the case. Authority permitting such an appeal was not cited nor found.

**2. Class Actions—class representative—adequate**

A class representative was adequate in a class action suit and settlement arising from the merger of Wachovia and Wells Fargo. Owning a relatively small number of shares is not a bar to a class member serving as a class representative, and there was no

EHRENHAUS v. BAKER

[216 N.C. App. 59 (2011)]

authority cited for the proposition that a trial court may not conduct a final certification hearing after the parties have agreed in principal to a settlement.

### 3. Class Actions—class counsel—adequate and sufficient representation

The Court of Appeals was not persuaded that the class counsel in a class action suit deprived the class of adequate and reasonable representation by virtue of a conflict of interest or insufficient class action proficiency.

### 4. Class Actions—bank merger—settlement agreement—opt-out rights not required

The trial court did not err in a class action suit by determining that due process did not require opt-out rights based on the claims that were articulated to the trial court. The predominant claim was plaintiff's attempt to enjoin the merger of two banks.

### 5. Banks and Banking—bank merger—Board's fiduciary duties

The Wachovia Board did not breach its fiduciary duties during a merger by employing improper deal protection measures, failing to comply with statutory share exchange requirements, and failing to make material disclosures. The statutes alleged to have been violated were not applicable; the class had little or no chance of prevailing on a breach of fiduciary duty claim against the Board related to an allegedly coercive share exchange; and, although plaintiff raised potentially meritorious claims related to the fiduciary duty to disclose material facts, additional disclosures made pursuant to the settlement largely alleviated those issues.

### 6. Banks and Banking—bank merger—approval of settlement—release of claims

The trial court did not err by approving a settlement involving the release of claims in a class action arising from a bank merger. Given the tumultuous market conditions and the time demands under which the Wachovia Board acted, the business judgment rule was likely insurmountable on the issue of release of claims.

### 7. Class Actions—public reaction—trial court's discretion

The trial court was in the best position to determine whether the public outcry over a class action settlement raised fairness

concerns grounded in law. The trial court's appraisal of the public reaction as "muted," which supported a finding that the settlement was fair, did not rise to the level of an abuse of discretion.

**8. Class Actions—approval of settlement—recommendations of counsel**

The trial court did not err when approving a class action settlement by basing its decision in part on the recommendations of counsel. Moreover, the contents of the notice to class members adequately apprised them of the proposed settlement and hearing.

**9. Class Actions—settlement—attorney fees**

The portion of an order approving a settlement in a class action that concerned attorney fees was remanded where the trial court did not make complete findings of fact and conclusions of law.

**10. Appeal and Error—preservations of issues—brief—authority not cited—issue not considered**

An issue was not reviewed on appeal where the brief did not contain any citations of legal authority on the issue and the appellants did not explain a legal principle that would entitle them to relief.

Appeal by Objectors-appellants from judgment entered 5 February 2010 by Judge Albert Diaz in Mecklenburg County Superior Court. Heard in the Court of Appeals 9 February 2011.

*Greg Jones & Associates, P.A., by Gregory Jones, and Wolf Popper LLP, by Robert M. Kornreich, Chet Waldman, and Carl L. Stine, for Plaintiff-appellee.*

*Robinson Bradshaw & Hinson, P.A., by Robert W. Fuller, Mark W. Merritt, Louis A. Bledsoe, III, and Adam K. Doerr, for Defendants-appellees.*

*Norwood Robinson and John H. Loughridge, pro se.*

HUNTER, JR., Robert N., Judge.

### I. Introduction

As of 30 September 2008, Wachovia Corporation ("Wachovia") was the nation's fourth largest banking institution. Founded in 1908, Wachovia's stock was widely held throughout this state. Many regarded Wachovia as a conservative, sound financial institution that

had survived previous financial crises such as the Great Depression. When the 2008 financial collapse began, Wachovia's loan portfolio was encumbered with a large number of mortgages that it had obtained through its 2007 acquisition of Golden West Financial Corporation ("Golden West"), the nation's second largest dedicated mortgage bank. These mortgage liabilities caused Wachovia's depositors and investors to lose confidence in that institution and a "run" on the bank developed, causing the Federal Deposit Insurance Corporation ("FDIC") to inform Wachovia's corporate officers and the Wachovia board of directors (the "Wachovia Board" or the "Board") that Wachovia needed to merge with a solvent financial institution or be placed into receivership. After negotiation with other financial institutions, the Board agreed to a merger proposal (the "Proposed Merger" or the "Merger") from Wells Fargo & Company ("Wells Fargo").

Shortly after the Proposed Merger was announced, Irving Ehrenhaus filed this class action, on behalf of a class consisting of all shareholders of Wachovia common stock (the "Class"), challenging the Merger and seeking injunctive relief. After the trial court granted in part and denied in part Ehrenhaus's motion for a preliminary injunction, the parties entered into a settlement (the "Proposed Settlement" or the "Settlement"), which resolved or released the Class's claims—both pending claims and any claims that could be asserted pertaining to the Merger. The trial court heard from several individuals and groups that objected to the Settlement, but ultimately approved the Settlement after a fairness hearing. The final Settlement did not release claims pending in other courts.

This appeal concerns the events which led to the precipitous decline of Wachovia, its subsequent Merger with Wells Fargo, the dissatisfaction with that Merger, the ensuing litigation and Settlement, and the dissatisfaction with that Settlement. Norwood Robinson and John H. Loughridge ("Objectors-appellants") are dissatisfied with the court-approved Settlement and raise five central arguments asking this court to reverse the Merger. First, they argue the trial court erred in denying Ehrenhaus's motion for a preliminary injunction, and in doing so, the trial court denied Wachovia shareholders' their statutory voting rights. Objectors-appellants' second argument is that the trial court failed to examine properly the qualifications and adequacy of the Class representative (Ehrenhaus) and his counsel. Third, Objectors-appellants contend the trial court approved an unreasonable, inadequate Settlement. Objectors-appellants' fourth argument is that Wachovia shareholders were wrongfully denied the right to opt

EHRENHAUS v. BAKER

[216 N.C. App. 59 (2011)]

out of the Class and pursue their own causes of action. Finally, Objectors-appellants argue the trial court erred in omitting certain evidence ·from the record and failing to consider that evidence in approving the Settlement. After careful review, we affirm in part and reverse in part.

## II. Factual & Procedural Background

The causes of the financial collapse were not at issue before the trial court. However, the events leading to the Wachovia–Wells Fargo Merger, and the rapidity with which they occurred, provide the context for the Board's decision to approve the Merger and the parties' decision to approve the Settlement. The following narrative is primarily derived from the factual findings contained in the trial court's orders. These findings are binding because they are either unchallenged or supported by competent evidence. *Blitz v. Agean, Inc.*, 197 N.C. App. 296, 300, 677 S.E.2d 1, 4 (2009).

### A. The Financial Crisis, Merger Negotiations, and Merger Approval

Beginning in the spring of 2008, a series of financial failures began to erode confidence in our nation's financial institutions. The following events culminated in a rapid decline in the public confidence in banks that held large positions in government-backed mortgage securities. On 7 September 2008 the United States government seized control of two mortgage giants: the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac).[1] On 15 September 2008, Lehman Brothers Holding, Inc. collapsed and filed for bankruptcy. The same day, Merrill Lynch & Co. avoided filing for bankruptcy by agreeing to be acquired by Bank of America. On 16 September 2008, the United States government agreed to a multi-billion dollar rescue plan for American International Group, Inc. ("AIG").

The Wachovia Board met by telephone on 16 September 2008. Management informed the Board that the bank was experiencing liquidity problems due to financial market conditions. The Board expressed a preference for the bank to remain an independent entity

---

1. Freddie Mac and Fannie Mae are government-sponsored enterprises whose stock was publically traded. These organizations would buy mortgages on the secondary market, pool them, and sell them as mortgage backed securities to investors. By purchasing mortgages from conventional lenders, the lenders assets could be used for additional loans, theoretically expanding the secondary mortgage market. The seizure of these institutions signaled that mortgage backed securities held by financial institutions were problematic to their holders, including investment banks.

EHRENHAUS v. BAKER

[216 N.C. App. 59 (2011)]

and directed management to pursue that goal. Realizing Wachovia might not be able to stand on its own, the Board also directed management to explore a potential merger. On 20 September 2008, U.S. government officials expressed concern to Wachovia's management concerning the bank's liquidity, encouraging management to enter discussion with an unidentified potential merger partner. Those negotiations proved fruitless.

On 25 September 2008, the FDIC seized the banking assets of Washington Mutual, Inc. That same day, the United States House of Representatives rejected the initial "bailout" plan proposed by the United States Department of the Treasury for the nation's financial system. These two events exacerbated Wachovia's liquidity crisis. Wachovia's share price descended to $1.84—down over 90 percent from the closing price ten days earlier. The Wachovia Board met again by telephone conference the following day, when management informed it that, if Wachovia did not arrange a merger by 29 September, the FDIC would place Wachovia's bank subsidiaries into receivership.

Wachovia engaged in parallel negotiations with Citigroup, Inc. and Wells Fargo over the terms of a potential merger during the weekend of 27 September 2008. However, both suitors were unwilling to move forward without government assistance in the form of a loss-sharing arrangement. On 28 September, the FDIC notified Wachovia that the bank posed a "systemic risk" to the banking system and that the FDIC intended to exercise its authority to force a sale of Wachovia to another financial institution. The FDIC rejected a Wachovia counterproposal that would have given the FDIC an equity stake in Wachovia and allowed the firm to remain independent.

Wachovia subsequently entered into a non-binding agreement in principle by which Citigroup would acquire Wachovia's bank subsidiaries with assistance from the FDIC. Citigroup would have paid Wachovia $2.16 billion in cash and/or stock and assumed $53.2 billion of Wachovia's debt. The merger would have left Wachovia as a standalone entity, but with its principal businesses limited to its retail brokerage and mutual fund operations. Disagreements between the two financial institutions remained, however, and Citigroup insisted the two firms finalize the deal by 3 October 2008. Shortly before 9:00 p.m. on 2 October 2008, Wells Fargo forwarded a merger agreement, approved by its board, to Wachovia representatives.

This merger agreement required Wachovia and Wells Fargo to conduct a separate share exchange, pursuant to which Wells Fargo

would acquire ten newly issued shares of Wachovia Series M, Class A Preferred Stock, representing 39.9 percent of Wachovia's aggregate voting rights, including the right to vote on the approval of the proposed merger, in exchange for 1000 shares of Wells Fargo common stock. These shares were subject to a "tail provision," providing they could not be redeemed by Wachovia for eighteen months following the shareholder vote on the merger agreement—even if the merger was not consummated. Unlike the proposed Citigroup merger, the proposed Wells Fargo merger did not contain a "material adverse change clause."[2] The exchange ratio provided that Wachovia's public shareholders would receive 0.1991 shares of Wells Fargo common stock in exchange for each share of Wachovia common stock they owned. The proposal also contained a "fiduciary out" provision that required Wachovia's Board to submit the merger to a vote even if the Board no longer recommended the merger.

The Wachovia Board convened at 11:00 p.m. to consider the Wells Fargo merger proposal. Perella Weinberg and Goldman Sachs, financial services firms hired to advise the Board, counseled the Board that the offer was fair under the circumstances and counseled against attempting to negotiate with Wells Fargo for more favorable terms in light of the time constraints imposed upon Wachovia by the FDIC. (The following day was the deadline to agree to the proposed Citigroup merger.) These advisors stated the exchange ratio was fair. In light of Wachovia's increasingly perilous liquidity problem, the FDIC's refusal to provide Wachovia with government assistance, and other considerations,[3] the Board was left with no reasonable alternative and unanimously voted to approve the Merger. Shortly thereafter, Wachovia notified Citigroup that Wachovia intended to merge with Wells Fargo.[4] The next day, the public announcement of the Merger

---

2. A material adverse change provision gives the acquiring company the right to walk away from the deal in the event the target company experiences a significant adverse event or a material decline in value in the time period between signing and closing.

3. Wachovia's financial advisors (Parella Weinberg and Goldman Sachs) both expected—pending completion of due diligence and a financial review of the final documentation—to be able to render an opinion that the exchange ratio pursuant to the merger agreement was fair to Wachovia's shareholders. These opinions were later confirmed in writing.

4. Citigroup initiated litigation to force Wachovia to merge with Citigroup, rather than Wells Fargo, but was ultimately unsuccessful.

agreement alleviated Wachovia's liquidity crisis; its share price closed at $6.21—up from the previous day's close of $3.91.[5]

On 8 October 2008, Ehrenhaus filed this class action on behalf of the public shareholders of Wachovia common stock against Wachovia, Wells Fargo, and members of the Wachovia Board. *See infra* Section II.B. Wachovia and Wells Fargo pressed on to consummate the Merger.

The Board of Governors of the Federal Reserve System (the "Fed Board") quickly approved the Merger agreement on 12 October 2008. In doing so, the Fed Board noted, "[T]he unusual and exigent circumstances affecting the financial markets [and] the weakened financial condition of Wachovia . . . justified expeditious action on [the Merger Agreement]." (Second and third alterations in original.)

Pursuant to a 1990 amendment to the Wachovia articles of incorporation, the Wachovia Board issued ten shares of Series M, Class A Preferred Stock pursuant to the share exchange agreement. Wachovia and Wells Fargo completed the share exchange on 20 October 2008. The Wachovia Board scheduled a special shareholders' meeting for 23 December 2008 for the purpose of voting on the Merger agreement.

## B. The Action and Preliminary Injunction Proceedings

Ehrenhaus's complaint challenged the Merger on the following grounds: (1) the share exchange, which provided Wells Fargo with 39.9 percent of the voting power for the Merger, invalidly disenfranchised Wachovia shareholders; (2) the tail provision was coercive with respect to the shareholder vote because it impeded the Board from seeking out other bidders for at least eighteen months after a shareholder vote rejecting the Merger; (3) the Merger provided Wachovia shareholders with insufficient consideration in exchange for their shares; and (4) the fiduciary out clause was inadequate because the Board would have been required to submit the Merger to a vote in the event of a superior proposal, rather than withdraw entirely from the Merger agreement. The complaint sought to enjoin the Merger or rescind it if consummated. The complaint also sought a judgment directing Defendants-appellees to pay the Class "all damages caused to them and account for all profits and any special benefits obtained as a result of their wrongful conduct."

---

5. Several days after the Board executed the merger documents, Wachovia reported a $9.1 billion loss for the second quarter of 2008 on 22 October 2008. Wachovia's poor performance was due in part to losses related to assets acquired as part of its purchase of Golden West.

EHRENHAUS v. BAKER

[216 N.C. App. 59 (2011)]

On 15 October 2008, Ehrenhaus moved for a preliminary injunction, seeking to invalidate the tail provision, the fiduciary out provision contained in the Merger agreement, and the issuance of the preferred stock to Wells Fargo. The trial court held a hearing on 24 November 2008. Wachovia shareholders did not personally receive notice of the hearing. At this time, however, the legal proceedings had attracted attention from the news media and public. The trial court received over 200 letters and emails from public officials, Wachovia shareholders, and others on the subject, most expressing dissatisfaction with the Proposed Merger. For example, the *Charlotte Observer* published an editorial entitled, "Let Shareholders Have Their Say on Wells Deal." No other shareholder sought to intervene under Rule 24 and offered to serve as class representative at any time prior to the fairness hearing.

The trial court granted in part and denied in part Ehrenhaus's preliminary injunction motion. Wachovia and Wells Fargo were successful in protecting the core components of the Merger. The trial court concluded the Board's approval of the Merger agreement was an informed decision, made in good faith, with an honest belief that the action was in the best interests of Wachovia and its shareholders. The trial court denied preliminary injunctive relief as to the issuance of the preferred stock and concluded the preferred stock did not disenfranchise Wachovia's shareholders because "Wells Fargo ha[d] not 'locked up' an absolute majority of the votes required for approval of the Merger Agreement." The existence of the preferred stock was not coercive or preclusive of another bidder, according to the trial court because, other than Citigroup, there was no other offer to consider, and it was unlikely that another suitor would emerge. Therefore, the trial court concluded the Board's decision to approve the merger agreement was reasonable under the circumstances. The trial court granted partial preliminary injunctive relief, voiding the tail provision because the court concluded the provision would impede the Board in fulfilling its fiduciary duty to seek out merger partners in the event a potential suitor's overtures had been rejected.

## C. The Amended Complaint, Negotiations, Terms of the Proposed Settlement, Merger Approval, Preliminary Class Certification, and Preliminary Settlement Approval

Following the issuance of the partial injunction, Ehrenhaus amended his complaint to allege Wachovia's proxy statement contained material false and misleading statements and omitted material

information related to the Merger. The parties began settlement nego-
tiations shortly thereafter, and on 17 December 2008, they entered
into a memorandum of understanding ("MOU") setting forth an agree-
ment-in-principle to settle the case. The settlement reflected in the
MOU required Wachovia to make additional disclosures regarding the
Merger (the "Additional Disclosures"). Pursuant to this require-
ment, Wachovia filed a Form 8-K with the Securities and Exchange
Commission, put out a press release, and published a post on its web-
site. These materials disclosed matters related to previous omissions
Ehrenhaus alleged in his complaint.

Wells Fargo agreed to absorb the cost of providing notice to the
Class of the proposed settlement and to pay up to $1.975 million in
attorney's fees to Class counsel. The final amount was to be awarded
by the court. The Proposed Settlement would release and discharge
all causes of action against Defendants-appellees arising from the
allegations contained in Ehrenhaus's complaint as well as any claims
not asserted in the complaint that Class members could have brought
related to the Merger. These claims expressly did not include (1)
enforcement of the Proposed Settlement or (2) "the claims asserted by
[the] plaintiffs in the 'Amended Class Action Complaint for Violations
of the Federal Securities Laws' " filed in the *Lipetz v. Wachovia Corp.*,
No. 08 Civ. 6171 (RJS) (S.D.N.Y.), litigation. The Proposed Settlement
agreement also provided that Class counsel would conduct confirma-
tory discovery to ensure the fairness of the Settlement.

On 23 December 2008, the Merger was approved by 76 percent of
the votes entitled to be cast of Wachovia's outstanding common and
preferred stock.[6] The firms consummated the Merger on 31 December
2008. During the time period between 31 December 2008 and 24 April
2009, Class counsel reviewed documents and took depositions to
examine the conduct of corporate officials with regard to the Merger.
Upon completing this due diligence, the parties entered into a stipu-
lation of settlement.

On 24 April 2009, the trial court granted preliminary approval of
the Proposed Settlement based on the parties' stipulation. This pre-
liminary approval order conditionally certified the case as a non-opt-
out class action, Ehrenhaus as Class representative, the law firm of
Wolf Popper LLP as Ehrenhaus's lead counsel, and Greg Jones &
Associates, P.A. as North Carolina Liaison Counsel. Pursuant to this

6. If the voting power held by Wells Fargo is completely disregarded, i.e., we
assume the shares were never issued to Wells Fargo, over 50 percent of the indepen-
dent Wachovia shareholders voted to approve the Merger.

order, Wells Fargo distributed over one million copies of a notice of the pending class action settlement to Class members.

## D. Objections to the Proposed Settlement and Resolution

At a settlement fairness hearing held on 20 August 2009, the trial court heard from several parties who objected to the Proposed Settlement, including Objectors-appellants Norwood Robinson and John H. Loughridge, Jr. Following the hearing, the Orange County Employees' Retirement System and a group led by John M. Rivers withdrew their objections after agreeing to a modification of the release of claims stipulation. These include claims not arising out of either the Merger or the negotiation of terms and disclosures related to the Merger. These also include claims arising from Wachovia's business or Defendants-appellees' acts or omissions before or after the Class period. Mr. Robinson and Mr. Loughridge filed an objection to the Revised Stipulation, attaching a complaint they and others filed asserting claims against Wachovia and the Wachovia Board related to Wachovia's 2006 acquisition of mortgage lender Golden West. All other objectors withdrew their objection to the Proposed Settlement.

On 5 February 2010, the trial court entered its final order certifying the Class and approving the Proposed Settlement. The court awarded $932,621.98 in attorney's fees to Class counsel.

### III. Analysis

Objectors-appellants make four general arguments on appeal: (1) the trial court should have enjoined the Merger; (2) the trial court erred in certifying the Class; (3) the trial court erred in approving the Settlement; and (4) the trial court failed to consider critical evidence.

North Carolina Rule of Civil Procedure 23 provides, "If persons constituting a class are so numerous as to make it impracticable to bring them all before the court, such of them, one or more, as will fairly insure the adequate representation of all may, on behalf of all, sue or be sued." N.C.R. Civ. P. 23(a). This rule is based on the federal counterpart to Rule 23 as it existed prior to 1966, when North Carolina adopted a modified version of the Federal Rules of Civil Procedure for state proceedings. *See generally Crow v. Citicorp Acceptance Co.*, 319 N.C. 274, 277–80, 354 S.E.2d 459, 463–64 (1987). While the language of North Carolina Rule 23 has remained constant, Federal Rule 23 has been amended, and the case law interpreting the rule is extensive. "[W]hile federal class action cases are not binding on [North Carolina courts,] we have held in the past that the reason-

ing in such cases can be instructive. This is so even though North Carolina's [Rule 23] . . . is quite different from the present federal Rule 23." *Scarvey v. First Fed. Sav. & Loan Ass'n.*, 146 N.C. App. 33, 41, 552 S.E.2d 655, 660 (2001) (citations omitted).

The requirements of establishing a class action have been established by our Supreme Court in *Crow*.

The party seeking to bring a class action under Rule 23(a) has the burden of showing that the prerequisites to utilizing the class action procedure are present. First, parties seeking to employ the class action procedure under our Rule 23 must establish the existence of a class. As we have indicated, the plaintiffs properly alleged the existence of a class. On remand, however, the plaintiffs also will be required to demonstrate the actual existence of the class.

The named representatives also must establish that they will fairly and adequately represent the interests of all members of the class. This prerequisite is a requirement of due process.

The named representatives must show that there is no conflict of interest between them and the members of the class who are not named parties, so that the interests of the unnamed class members will be adequately and fairly protected. The named parties also must have a genuine personal interest, not a mere technical interest, in the outcome of the action.

The class representatives within this jurisdiction also must establish that they will adequately represent those outside the jurisdiction. The class the plaintiffs in the present case seek to represent is defined as including only "current residents of North Carolina." Therefore, by definition, there are no class members outside the jurisdiction.

Parties seeking to utilize Rule 23 also must establish that the class members are so numerous that it is impractical to bring them all before the court. It is not necessary that they demonstrate the impossibility of joining class members, but they must demonstrate substantial difficulty or inconvenience in joining all members of the class. There can be no firm rule for determining when a class is so numerous that joinder of all members is impractical. The number is not dependent upon any arbitrary limit, but rather upon the circumstances of each case.

Additionally, although Rule 23(a) says nothing about the need for notice to members of the class represented, we believe that fun-

damental fairness and due process dictate that adequate notice of the class action be given to them. The actual manner and form of the notice is largely within the discretion of the trial court. The trial court may require, among other things, that it review the content of any notice before its dissemination.

The trial court should require that the best notice practical under the circumstances be given to class members. Such notice should include individual notice to all members who can be identified through reasonable efforts, but it need not comply with the formalities of service of process. Notice of the action should be given as soon as possible after the action is commenced. As part of the notification, the trial court may require that potential class members be given an opportunity to request exclusion from the class within a specified time in a manner similar to the current federal practice.

319 N.C. at 282–84, 354 S.E.2d at 465–66.

In reviewing the decisions of a trial court involving class certifications, our Supreme Court has instructed us to apply the abuse of discretion standard. *Frost v. Mazda Motor of Am., Inc.*, 353 N.C. 188, 199, 540 S.E.2d 324, 331 (2000). A trial court abuses its discretion when its "decision is manifestly unsupported by reason or so arbitrary that it could not have been the result of a reasoned decision." *Id.* (citations omitted) (internal quotation marks omitted).

Rule 23(c) provides, "A class action shall not be dismissed or compromised without the approval of the judge." Because settlements are "compromises," a class action must therefore be subject to judicial review before it can be effectuated. While our business courts have reviewed class action settlements with regularity under a "fairness, reasonable and adequacy" standard based upon persuasive authority developed by federal courts and cases from other jurisdictions, no North Carolina appellate court has specifically reviewed this standard. For example, Judge Diaz in his February 2008 opinion viewed the standards as follows:

Settlement has long been favored over litigation, and public policy favors upholding good faith settlements, even without strong regard to the consideration underlying the settlement.

In light of the law and policy favoring settlement, federal courts reviewing a settlement agreement in class action cases conduct first a preliminary approval hearing to determine whether there is

probable cause to notify class members of the proposed settlement, then a fairness hearing to determine if the proposed settlement is "fair, reasonable, and adequate." The burden is on the proponents of the settlement to demonstrate the proposed settlement is fair, reasonable, and adequate.

The weight given to each factor in evaluating the fairness, reasonableness, and adequacy of a proposed class action settlement varies depending on the circumstances of a given case. Generally, a trial court should ensure that the proposed settlement is "not the product of collusion between the parties," and should evaluate its terms relative to the strength of the plaintiff's case.

In addition to the strength of the plaintiff's case, some factors commonly evaluated include: (a) the defendant's ability to pay; (b) the complexity and cost of further litigation; (c) the amount of opposition to the settlement; (d) class members' reaction to the proposed settlement; (e) counsel's opinion; and (f) the stage of the proceedings and how much discovery has been completed. (Citations omitted.)

Our judicial system has a strong preference for settlement over litigation. Courts are generally indifferent to the nature of the parties' agreement; *why or how* the case is settled is of little concern. *See, e.g., Knight Publ'g Co., Inc. v. Chase Manhattan Bank, N.A.*, 131 N.C. App. 257, 262, 506 S.E.2d 728, 731 (1998) ("The real consideration is not found in the parties['] sacrifice of rights, but in the bare fact that they have settled the dispute."). This preference for settlement applies to class actions. *See Ass'n For Disabled Americans v. Amoco Oil Co.*, 211 F.R.D. 457, 466 (S.D. Fla. 2002) ("There is an overriding public interest in favor of settlement, particularly in class actions that have the well-deserved reputation as being most complex."). But due to unique due process concerns implicated by binding a group of individuals not before the court, we *are* concerned with the circumstances and terms of class action settlements. Thus, parties cannot settle a class action without court approval. N.C.R. Civ. P. 23(c). The purpose of the settlement approval requirement is to

(1) assure[] that any person whose rights would be affected by settlement has the opportunity to support or oppose it; (2) prevent[] private arrangements that may constitute "sweetheart deals" contrary to the best interests of the class; (3) protect[] the rights of those whose interests may not have been given due regard by the negotiating parties; and finally, (4) assure[] each

EHRENHAUS v. BAKER

[216 N.C. App. 59 (2011)]

member of the class that his or her integrity and right to express views and be heard on matters of vital personal interest has not been violated by others who have arrogated to themselves the power to speak and bind without consultation and consent.

*In re Agent Orange Prod. Liab. Litig.*, 597 F. Supp. 740, 758 (E.D.N.Y. 1984) (citations omitted), *aff'd sub nom., In re Agent Orange Prod. Liab. Litig. MDL No.* 381, 818 F.2d 145 (2d Cir. 1987).

A trial court evaluating a class action settlement should follow the two-step procedure generally employed by federal courts. First, the trial court should conduct "a preliminary approval or pre-notification hearing to determine whether the proposed settlement is 'within the range of possible approval' or, in other words, whether there is 'probable cause' to notify the class of the proposed settlement." *Horton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 855 F. Supp. 825, 827 (E.D.N.C. 1994). If the trial court grants preliminary approval, "notice is sent to the class, [and] the court conducts a 'fairness' hearing, at which all interested parties are afforded an opportunity to be heard on the proposed settlement." *Id.*; *cf. Frost*, 353 N.C. at 197, 540 S.E.2d at 330 ("[N.C.] Rule 23 does not by its terms require notice to class members, but adequate notice is dictated by 'fundamental fairness and due process.' " (quoting *Crow*, 319 N.C. at 283, 354 S.E.2d at 466)). At this second hearing, the trial court must ascertain whether the proposed settlement is "fair, reasonable, and adequate." *Horton*, 855 F. Supp. at 827. Proponents of class action settlements bear the burden of showing the settlement meets this standard. *Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1147 (11th Cir. 1983). Appellate courts review the decision to approve a settlement for abuse of discretion. 7B Charles Alan Wright et al., *Federal Practice & Procedure* § 1797.1, at 80 (3d ed. 2005); *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) ("[T]he decision to approve or reject a settlement is committed to the sound discretion of the trial judge because he is exposed to the litigants, and their strategies, positions and proof." (quotation marks omitted) (citation omitted).

When reviewing a class action settlement, the trial court must protect, to the extent practicable, the rights of passive class members. It should also be sensitive to the possibility of collusion by the parties actively involved in the case. Wright et al., *supra*, § 1797.1, at 79. "[I]t is generally accepted that where settlement precedes class certification (e.g., approval for settlement and certification are sought simultaneously, as is the case here) district courts must be 'even more scrupulous than usual' when examining the fairness of the

proposed settlement." *In re Sprint Corp. ERISA Litig.*, 443 F. Supp. 2d 1249, 1255 (D. Kan. 2006) (citation omitted). Courts consider a variety of factors in evaluating a settlement, giving heavy weight to two in particular. The first is the likelihood the class will prevail should litigation go forward and the potential spoils of victory, balanced against benefits to the class offered in the settlement. *State of W. Va. v. Chas. Pfizer & Co.*, 440 F.2d 1079, 1085 (2d Cir. 1971); *see also Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25, 20 L. Ed. 2d 1, 10 (1968) ("Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation. It is here that we must start in the present case."). The second is the class's reaction to the settlement. *Sala v. Nat'l R.R. Passenger Corp.*, 721 F. Supp. 80, 83 (E.D. Pa. 1989) ("[T]he reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy.").

Professor Wright emphasizes, among other things,

> the points of law on which the settlement is based[;] . . . if the action went forward, the plan for allocating the settlement among the class members or for distributing the settlement to the class[;] whether proper procedures were adopted for giving notice to the absent class members[;] and whether a settlement would waive other viable claims.

Wright et al., *supra*, § 1797.1, at 82–94 (footnotes omitted); *see also* 4 Abba Conte & Herbert Newberg, *Newberg on Class Action* § 13:68, at 479-81 (4th ed. 2002). The opinion of counsel is also a relevant factor. *Armstrong v. Bd. of Sch. Dir. of City of Milwaukee*, 616 F.2d 305, 314 (7th Cir. 1980), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998).

Because the trial court's final order both certified the class and approved a final settlement, Objectors-appellants contest portions of each determination. Of the multiple *Crow* requirements to certify a class, Objectors-appellants contest only two requirements: the adequacy of class representative, *see infra* Section III.B.1; and the adequacy of class counsel, *see infra* Section III.B.2. Objectors-appellants also raise a due process argument concerning the trial court's decision to certify the Class as a non-opt-out class, *see infra* Section III.B.3. Objectors-appellants also contend the trial court approved a settlement that was not fair, adequate and reasonable. *See infra* Section III.C.

Our analysis proceeds as follows. Objectors-appellants' first contention is that the trial court erred in denying Ehrenhaus's motion for a preliminary injunction. Appellees respond that Objectors-appellants lack standing to appeal the denial of the injunction. While we decline to answer that question, *see infra* Section III.A, the substantive issues raised by Objectors-appellants' preliminary injunction argument are resolved in other portions of our analysis.

We next turn to Objectors-appellants' argument that Ehrenhaus, as Class representative, and his attorneys, as Class counsel, are not qualified to serve the Class. *See infra* Sections III.B.1–2, respectively. We then address the third class certification issue: whether the trial court erred in certifying a non-opt-out class. *See infra* Section III.B.3.

Objectors-appellants next take issue with the trial court's decision to approve the Settlement. Our review examines (1) the probability the Class would have prevailed had this matter been litigated in full and the potential benefits to the Class, *see* Section III.C.1; (2) the merits of a claim that was not the thrust of Ehrenhaus's litigation strategy: a claim for damages against the Wachovia Board, *see* Section III.C.2; and (3) the reaction of the Class, recommendations of counsel, and notice adequacy, *see* Section III.C.3.

We then turn to the trial court's award of attorney's fees. *See infra* Section III.C.4. Finally, we address Objectors-appellants' allegations that the trial court omitted evidence from the record and refused to consider material evidence. *See infra* Section III.D.

## A. The Denial of the Motion for a Preliminary Injunction

**[1]** Objectors-appellants argue the trial court erred in denying Ehrenhaus's motion for a preliminary injunction to enjoin the issuance of Series M shares to Wells Fargo. Specifically, they argue Wachovia's articles of incorporation did not authorize the issuance of the shares.

Before attempting to settle the case, Ehrenhaus sought to enjoin the issuance of these shares to Wells Fargo. After failing to convince the trial court to issue the preliminary injunction, Ehrenhaus opted to settle. Objectors-appellants became involved in this case only when Appellees sought court approval of the settlement. Prior to that time, they did not seek to intervene or to represent the Class themselves. Thus, Objectors-appellants not only appeal the class certification and settlement approval—which were entered after objectors-appellants intervened in this case through the objection process—but also seek appellate review of an order entered *before* they participated in this case.

Appellees contend Objectors-appellants have no right to appeal the denial in part of the injunction. Objectors-appellants have not directed us to any binding authority establishing that a party may appeal under these circumstances. Nor has our research discovered any. Neither party has briefed the practical strengths or weaknesses of a procedural rule that would permit an objector to appeal under these circumstances. For this reason, and because we address the substance of Objectors-appellant's argument below, *see infra* Section III.B (reviewing the fairness of the Settlement), we decline to expound on whether Objectors-appellants have a right to appeal the denial of a preliminary injunction under these circumstances.

## B. Class Certification

The trial court's decision to certify the class was appropriately based on the *Crow* requirements. We now consider (1) whether the Class representative was adequate; (2) whether Class counsel was adequate; and (3) whether Class members should have been permitted to opt-out.

### 1. Class representative

[2] Objectors-appellants argue Ehrenhaus was an inadequate Class representative and that the trial court selected him as the Class representative because the court failed to conduct an adequate inquiry of his qualifications. We disagree.

The trial court concluded Ehrenhaus

> fairly and adequately represents the interests of the Class because [Ehrenhaus] is a Class member with the same legal claims as the other Class members, he has a genuine personal interest in the outcome of the litigation, and he has no conflict of interest with other Class members because he will not receive compensation for serving as Class Representative.

Ehrenhaus owned 1080 shares of Wachovia stock before Wells Fargo acquired the stock and will not be compensated for serving as Class representative. Objectors-appellants fail to direct us to any fact indicating Ehrenhaus's interest in the litigation would be different from the remainder of the Class. Their brief implies that his ownership of 1080 shares is problematic because there were over two billion outstanding shares of Wachovia stock. But owning a (relatively) small number of shares is not a bar to a class member serving as class representative. *Cf. Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984) ("Differences in the amount of damages

EHRENHAUS v. BAKER

[216 N.C. App. 59 (2011)]

between the class representative and other class members does not affect typicality.").[7]

Objectors-appellants maintain "[t]here was no one to represent the Wachovia Shareholders after the MOU was executed." Essentially, Objectors-appellants object to the trial court conducting a final certification hearing after the parties entered into the MOU and contend that, once the MOU was consummated, the parties were colluding to the shareholders' detriment. Objectors-appellants cite no authority for the proposition that a trial court may not conduct a final certification hearing after the parties have agreed in principle to a settlement, and we see no reason why the trial court's approach was inappropriate, particularly in light of the time constraints imposed by financial crisis. In contending the Class received no representation following the date of the MOU, Objectors-appellants completely fail to mention the extensive post-MOU discovery conducted by Class counsel in order to confirm the Proposed Settlement was fair and adequate.

After the parties agreed on the MOU, Class counsel conducted four depositions and reviewed nearly 10,000 pages of documents. The Settlement was contingent on Ehrenhaus determining whether the discovery confirmed the Settlement was fair; Ehrenhaus could walk away from the Proposed Settlement, in his sole discretion, if the confirmatory discovery indicated the Settlement was unfair. Ehrenhaus retained a financial advisor to provide an opinion concerning deficiencies in the proxy statement as well. Objectors-appellants have not referred us to anything in the record indicating Ehrenhaus or Class counsel were covertly engaged in conduct contrary to the Class's best interests. Finally, we note that no other shareholder came forward at this time to intervene seeking to serve as Class representative.

### 2. Class counsel

[3] Objectors-appellants also take issue with the adequacy of Class counsel. They maintain "there was a direct conflict of interest between the attorneys and their clients, shareholders, forward" following the date of the MOU. Objectors-appellants do not, however, explain what this conflict is. They take issue with Class counsel being paid on a contingency basis, citing the North Carolina Rules of Pro-

---

7. Objectors-appellants do not point to any evidence in the record that Ehrenhaus purchased stock immediately prior to the Merger for the sole purpose of challenging the Merger or that he conspired with management to engage in sweetheart litigation to eliminate legitimate claims of Class members. Had such evidence existed, the Court's determination may have been different, but speculation that such a conflict of interest is present is very distinct from proof of such a conflict.

fessional Conduct for the proposition that "Rule 1.8(f) . . . recognizes the inherent conflict where a third party defendant (Wells Fargo) pays for a litigant's attorneys fee [sic]," but provide no further analysis. Rule 1.8(f) does not prohibit a lawyer from representing a class on a contingency basis. In fact, some class actions "are by their very nature contingency fee cases." *Long v. Abbott Laboratories*, 97-CVS-8289, 1999 WL 33545517 (N.C. Super. July 30, 1999) (discussing class actions that create a common fund). We also note that the trial court found that Class counsel is "highly respected and experienced in share-holder class action litigation." We are not persuaded that Class counsel deprived the Class of adequate and reasonable representation by virtue of a conflict of interest or insufficient class action proficiency.

### 3. Opt-out certification

[4] Objectors-appellants contend the trial court's certification of a non-opt-out Class fell below procedural guarantees of the Due Process Clause of the Constitution of the United States. Specifically, Objectors-appellants maintain they should have been able to opt out of the Class and bring an action seeking damages. As this issue concerns a question of law, we review the trial court's decision in this matter *de novo. Blitz*, 197 N.C. App. at 300, 677 S.E.2d at 4. Citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 n.3, 86 L. Ed. 2d, 628, 642 n.3 (1985), the trial court concluded the Class did not require opt-out rights because the parties did not attempt to bind Class members with respect to claims predominantly seeking monetary relief. In doing so, the court explained that, from the outset, Ehrenhaus pled and litigated the case as one seeking predominantly equitable relief.

The trial court focused on whether Ehrenhaus's claim sought equitable, rather than monetary, relief. The trial court's analysis relied heavily on the "predominance" opt-out analysis employed by many courts. Although the United States Supreme Court recently criticized reliance on that analysis, we nevertheless hold the trial court reached the correct result.

The term "opt-out" refers to a class member's ability exclude himself from a class-action settlement. By opting out, the class member avoids the preclusive effect of the settlement, in that he is free to bring his own lawsuit. He also forgoes any payments he might receive from the settlement.

In *Shutts*, the United States Supreme Court held that, when a class action seeks to bind the class members "concerning claims wholly or predominately for money judgments," due process requires

opt-out rights for class members. *Id.* at 812 n.3, 86 L. Ed. 2d at 642 n.3. Federal Rule 23 authorizes non-opt-out classes, and the federal courts have developed a substantial, albeit somewhat inconsistent, body of law pertaining to class certification and opt-out rights. Under Federal Rule 23, there are three categories of class actions: the (b)(1) class, which, as a general matter, can be certified when individual adjudication is unworkable; the (b)(2) class, which can be certified when injunctive or declaratory relief will affect the entire class at once; and the (b)(3) class, which can be certified when a class action is a superior manner of adjudicating common questions of law or fact applicable to the entire class. *See* Fed. R. Civ. P. 23(b); *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 412 (5th Cir. 1998). Federal Rule 23 requires opt-out rights for (b)(3) classes, but not (b)(1) and (b)(2) classes. Consequently, federal court decisions concerning whether (b)(1) and particularly (b)(2) classes are appropriate are instructive. *See Frost*, 353 N.C. at 196, 540 S.E.2d at 330 (stating our decisions should be informed by federal decisions where appropriate).

There are numerous federal decisions stating (b)(2) certification is appropriate, even when the action seeks monetary relief, provided the damages sought do not "predominate" or are "incidental" to the injunctive relief. *E.g.*, *Lemon v. Int'l Union of Operating Engineers, Local No. 139, AFL-CIO*, 216 F.3d 577, 581 (7th Cir. 2000); *Allison*, 151 F.3d at 412; *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1175 (8th Cir. 1995); *see also Manual for Complex Litigation (Fourth)* § 21.221 (2004). When the class representative seeks injunctive or declaratory relief, a non-opt-out class is necessary "to avoid unnecessary inconsistencies and compromises in future litigation." *DeBoer*, 64 F.3d at 1175. If a prospective settlement cannot bind all members of the class, the defendant has little motivation to settle. The underlying premise of the (b)(2) class is that it enjoys uniformity and therefore a lack of conflicts among class members. *Allison*, 151 F.3d at 413. "[A] class seeking primarily equitable relief for a common injury is assumed to be a cohesive group with few conflicting interests, giving rise to a presumption that adequate representation alone provides sufficient procedural protection." *In re Veneman*, 309 F.3d 789, 792 (D.C. Cir. 2002). However, this homogeneity breaks down when claims for monetary relief hinge on individual injuries that differ across the class. *Allison*, 151 F.3d at 413.

The federal courts' analysis (implicitly, for the most part) involves a balancing of judicial economy and the procedural component of the Fourteenth Amendment. *See Wal-Mart Stores v. Dukes*,

564 U.S. \_\_\_, \_\_\_, 180 L. Ed. 2d 374, 397-98 (2011) ("Similarly, (b)(2) does not require . . . opt-out rights, presumably because it is thought (rightly or wrongly) that notice has no purpose when the class is mandatory, and that depriving people of their right to sue in this manner complies with the Due Process Clause."). "The fundamental requisite of due process of law is the opportunity to be heard." *Grannis v. Ordean*, 234 U.S. 385, 394, 58 L. Ed. 1363, 1369 (1914). When homogeneity exists and the class's interests are aligned, non-opt-out certification does not offend due process. We assume each litigant does not *need* to be heard individually. But when uniformity is lacking, the class members' interests may not be aligned. Individual class members must be able to opt-out in these situations and exercise their right to be heard.

Recently, in *Wal-Mart Stores*, the United States Supreme Court noted that there was a "serious possibility" that the Due Process Clause might forbid the certification of monetary claims in non-opt-out classes, even when they do not predominate. 564 U.S. at \_\_\_, 180 L. Ed. 2d at 398. This possibility was one reason why the Court determined the class action could not be certified under (b)(2). *Id*. The Court explained that a "mere 'predominance' " of a proper (b)(2) claim does not cure notice and opt-out problems. *Id*. In *Wal-Mart Stores*, the named plaintiffs pleaded claims for injunctive relief and monetary relief in the form of back pay, which is equitable in nature. *Id*. They did not plead claims seeking compensatory damages. *Id*. This made it less likely that the monetary claims asserted in the lawsuit would predominate. *Id*. The Court explained that this strategy

> also created the possibility (if the predominance test were correct) that individual class members' compensatory-damages claims would be *precluded* by litigation they had no power to hold themselves apart from. If it were determined, for example, that a particular class member is not entitled to backpay because her denial of increased pay or a promotion was *not* the product of discrimination, that employee might be collaterally estopped from independently seeking compensatory damages based on the same denial. That possibility underscores the need for plaintiffs with individual monetary claims to decide for *themselves* whether to tie their fates to the class representatives' [sic] or go it alone—a choice Rule 23(b)(2) does not ensure that they have.

*Id*.

**EHRENHAUS v. BAKER**

[216 N.C. App. 59 (2011)]

The Court explicitly stated that its ruling did not address whether *any* form of incidental monetary relief could comply with the Due Process clause, *Id.*, but it does indicate courts must be careful—more careful than they have previously been—to protect class members' due process rights when monetary claims are involved. *Wal-Mart Stores* also establishes that the claims pled by the named plaintiff are not the only claims that must be considered. It is critical that courts determine whether it offends due process to preclude monetary claims that are *not* plead as a basis for relief.

In this case, Objectors-appellants take issue with the preclusion of potential claims for damages against the Wachovia Board. These claims were not articulated before the trial court. The only claims brought to this Court's attention on appeal that could be brought as a class action are potential claims for diminution of shareholder voting strength and inadequate merger consideration. Because no Class member presented these to the trial court, there is no record for us to review. Although a trial court should examine potential liability of the Board for claims before approving a settlement, without a proffer by an Objector, an evaluation of any additional and unarticulated claims by this court would be speculative. Furthermore, it appears to us that the equitable claims brought by Ehrenhaus fully resolve any claim for diminution of shareholder voting strength, and the record fails to disclose any set of facts upon which a claim for inadequate merger consideration could have been based. We need not address the issue of whether any derivative action could have been brought because the procedural requirements for bringing such a claim are not in the record and it is unlikely that any such claim would be successful under these factual circumstances.

The predominant claim here was Ehrenhaus's attempt to enjoin the Merger. Objectors-appellants did not explain to the trial court, with any specificity, what causes of action they wished to bring and how the nature of those claims might impact the due process analysis. Our role is to review the trial court's ruling. Based on the claims that were articulated to the trial court by Appellees and Objectors-appellants, the trial court correctly determined due process does not require opt-out rights in this case.

\*       \*       \*       \*

In conclusion, we disagree with Objectors-appellants' three arguments challenging class certification. First, the trial court's selection

of Ehrenhaus as Class representative did not deprive the Class of adequate representation. Second, we are not persuaded Class counsel was inadequate. Third, the trial court did not err certifying a non-opt-out class. Therefore, we hold the trial court did not err in certifying this class action.

## C. Settlement Approval

### 1. The likelihood of success and the benefits of the Settlement

[5] The amended complaint sought relief based on allegations that the Wachovia Board breached its fiduciary duties by employing improper deal protection measures, failing to comply with statutory share exchange requirements, and failing to make material disclosures concerning the Merger. The amended complaint also alleged an aiding and abetting breach of fiduciary duty claim against Wells Fargo. Corporate directors owe fiduciary duties to the corporation. *Pierce Concrete, Inc. v. Cannon Realty & Constr. Co., Inc.*, 77 N.C. App. 411, 413–14, 335 S.E.2d 30, 31 (1985). A fiduciary duty is

> one in which "there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence . . . , [and] it extends to any possible case in which a fiduciary relationship exists in fact, and in which there is confidence reposed on one side, and *resulting domination and influence on the other.*"

*Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707–08 (2001) (quoting *Abbitt v. Gregory*, 201 N.C. 577, 598, 160 S.E. 896, 906 (1931) (some citations omitted). The General Statutes prescribe a standard of conduct for corporate directors: a director must discharge his duties "(1) [i]n good faith; (2) [w]ith the care an ordinarily prudent person in a like position would exercise under similar circumstances; and (3) [i]n a manner he reasonably believes to be in the best interests of the corporation." N.C. Gen. Stat. § 55-8-30(a) (2009).

> In discharging his duties a director is entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, if prepared or presented by:
>
> (1) One or more officers or employees of the corporation whom the director reasonably believes to be reliable and competent in the matters presented;

(2) Legal counsel, public accountants, or other persons as to matters the director reasonably believes are within their professional or expert competence; or

(3) A committee of the board of directors of which he is not a member if the director reasonably believes the committee merits confidence.

N.C. Gen. Stat. § 55-8-30(b). "The duties of a director weighing a change of control situation shall not be any different, nor the standard of care any higher, than otherwise provided in this section." N.C. Gen. Stat. § 55-8-30(d).

The business judgment rule is a standard of review courts use to determine whether directors have met the statutory standard of conduct. The rule

creates, first, an initial evidentiary presumption that in making a decision the directors acted with due care (i.e., on an informed basis) and in good faith in the honest belief that their action was in the best interest of the corporation, and second, absent rebuttal of the initial presumption, a powerful substantive presumption that a decision by a loyal and informed board will not be overturned by a court unless it cannot be attributed to any rational business purpose.

*Hammonds v. Lumbee River Elec. Membership Corp.*, 178 N.C. App. 1, 20–21, 631 S.E.2d 1, 13 (2006) (quoting Russell M. Robinson, II, *Robinson on North Carolina Corporation Law* § 14.06, at 14-16 to -17 (2005)).

We first address the allegation in Ehrenhaus's amended complaint that the share exchange violated Chapter 55 of the General Statutes when Wachovia issued the Wachovia Series M, Class A Preferred Stock, representing 39.9 percent of the Wachovia's aggregate voting rights in exchange for 1000 shares of Wells Fargo common stock. (The class is prohibited from mounting further challenges to the share exchange by the Settlement.)

Ehrenhaus alleged, and Objectors-appellants maintain, the Wachovia Board failed to comply with subsection 55-10-03(b), which states that "after adopting the proposed amendment [of the articles of incorporation] the board of directors must submit the amendment to the shareholders for their approval." N.C. Gen. Stat. § 55-10-03(b) (2009). In a proper case, a breach of fiduciary duty claim may be premised on a violation of the North Carolina Business Corporation

Act. *See Robinson, supra*, § 14.03[3], at 14-9 to -10 ("The duty of care requires the directors of every corporation to see that it is operated according to the terms of its articles of incorporation, and, it would seem, also according to law." (footnotes omitted)); *Miller v. Am. Tel. & Tel. Co.*, 507 F.2d 759, 763 (3d Cir. 1974) (concluding statutory violation could form the basis for breach of fiduciary duty claim). Objectors-appellants contend an amendment is required because section 55-10-02, which provides a list of amendments that do not require shareholder approval, does not authorize the issuance of shares that will dilute shareholder voting rights. *See* N.C. Gen. Stat. § 55-10-02 (2009). This line of reasoning assumes an amendment to the articles of incorporation was required.

Subsection 55-6-01(a) states that "[t]he articles of incorporation must prescribe the classes of shares and the number of shares of each class that the corporation is authorized to issue." N.C. Gen. Stat. § 55-6-01(a) (2009). Aside from several exceptions not applicable here, "after adopting [a] proposed amendment the board of directors must submit the amendment to the shareholders for their approval." N.C. Gen. Stat. § 55-10-03(b) (2009). In 1990, the Wachovia (then First Union Corporation) shareholders authorized the Board to issue the Class A preferred shares. The articles of incorporation were modified to allow the board to issue "Class A Preferred Stock." The amendment permitted the Board to issue the shares "from time to time in one or more series." It also authorized the Board to set the "provisions as to voting rights, if any." Thus, it appears the shareholders previously authorized the Series M, Class A Preferred Stock.

Objectors-appellants also point out that section 55-10-04 provides circumstances under which shareholders must be entitled to vote as a class. *See* N.C. Gen. Stat. § 55-10-04 (2009). But this section applies to amendments to articles of incorporation—not the issuance of a class of shares already authorized by articles of incorporation. *See id.*

Objectors-appellants next argue that, pursuant to subsection 55-11-03(a), the Board was required to submit the share exchange to the shareholders for a vote. Subsection 55-11-03(a) provides:

After adopting a plan of merger or share exchange, the board of directors of each corporation party to the merger, and the board of directors of the corporation whose shares will be acquired in the share exchange, shall submit the plan of merger . . . or share exchange for approval by its shareholders.

N.C. Gen. Stat. § 55-11-03(a) (2009). However, the term "share exchange," as it is employed by Chapter 55, does not apply to the transaction between Wachovia and Wells Fargo. Under Chapter 55, a share exchange is "a transaction by which a corporation becomes the owner of all the outstanding shares of one or more classes of another corporation by an exchange that is compulsory on all owners of the acquired shares." N.C. Gen. Stat. § 55-11-02 commentary (2009); *see also* N.C. Gen. Stat. § 55-11-02(a) ("A corporation may acquire all of the *outstanding* shares of one or more classes or series of another corporation if the board of directors of each corporation adopts and its shareholders . . . approve the exchange." (emphasis added)). This transaction was not compulsory on any owners of the acquired shares because they were *issued directly to Wells Fargo*. There were no prior-owners of the acquired shares. Wells Fargo provided consideration to Wachovia in the form of Wells Fargo shares, but this type of "share exchange" does not trigger the voting rights set forth in section 55-11-03.

We also conclude the Class had little or no chance of prevailing in a breach-of-fiduciary-duty claim against the Wachovia Board related to allegations that the share exchange was coercive. Among other prerequisites, in order for Wachovia and Wells Fargo to merge, a majority of Wachovia shareholder votes needed to be cast in favor of the Merger. *See* N.C. Gen. Stat. §§ 55-11-01, -03 (2009). The failure to vote in favor of the Merger amounted to a vote against it. *See id.*

Our research does not disclose any controlling authority on such a claim. Based on our review of Delaware decisions, we conclude that, in North Carolina, a deal protection measure, such as the share exchange here, cannot be so coercive that it deprives the pre-exchange shareholders of the opportunity to exercise their voting rights in a meaningful way. If "the vote will be a valid and independent exercise of the shareholders' franchise, without any specific pre-ordained result which precludes them from rationally determining the fate of the proposed merger [a court] has no basis to intervene." *In re IXC Communications, Inc. S'holder Litig.*, No. 17334, 1999 Del. Ch. LEXIS 210 at *3 (Oct. 27, 1999). Two Delaware decisions illustrate this principle.

In *In re IXC Communications, Inc. S'holder Litig.*, Vice Chancellor (now Delaware Chief Justice) Steele addressed a similar situation. The case involved a merger between IXC Communications, Inc. ("IXC") and Cincinnati Bell, Inc. ("CBI"). *Id.* at *2. The General Electric Pension Trust ("GEPT") was IXC's largest shareholder. *Id.* at *7. CBI acquired

half of GEPT's IXC holdings and secured a promise from GEPT to support the IXC-CBI merger with GEPT's remaining shares. *Id.* at *21. This effectively gave CBI control of about 40 percent of IXC's shares. *Id.* at *23.

Noting that an independent majority of IXC shareholders controlled nearly 60 percent of all IXC shares, Chief Justice Steele stated that CBI had "not, in fact, 'locked up' an absolute majority of the votes required for the merger through the GEPT deal." *Id.* at *23–24. He opined that " '[a]*lmost locked up*' does not mean 'locked up,' and 'scant power' may mean less power, but it decidedly does not mean 'no power.' " *Id.* at *24. Because "a numerical majority" of independent shareholders were in a position to defeat the merger, he concluded, the vote-buying agreement did not "have the purpose or effect of disenfranchising this remaining majority of shareholders." *Id.*

In *Omnicare, Inc. v. NCS Healthcare, Inc.*, the Supreme Court of Delaware held that a corporate board of directors cannot "accede to [a controlling shareholder] demand for an absolute 'lock-up.' " 818 A.2d 914, 938 (Del. 2003). There, Genesis, Health Care Ventures, Inc. ("Genesis") and Omnicare, Inc. ("Omnicare") were competing to acquire NCS Healthcare, Inc. ("NCS"). *Id.* at 917. The NCS board approved a merger agreement with Genesis pursuant to which the NCS board was required to place the agreement before the NCS shareholders for a vote, even if the NCS board no longer recommended the merger. *Id.* at 918. Two NCS stockholders held a majority of the shareholder voting power; they entered into an agreement to vote all of their shares in favor of the merger. *Id.* The NCS board eventually withdrew its support for the merger, submitting it to the shareholders with a recommendation that the shareholders reject the proposed merger because the competing Omnicare bid was a superior transaction. *Id.*

In holding the NCS board breached its fiduciary duty to minority shareholders, the court explained that its decision

[did] not involve the general validity of either stockholder voting agreements or the authority of directors to insert a . . . provision in a merger agreement [requiring the board to submit a merger to the shareholders even if the board later came to disapprove of the merger]. In this case, the NCS board combined those two otherwise valid actions and caused them to operate in concert as an absolute lock up, in the absence of an effective fiduciary out clause in the Genesis merger agreement.

**EHRENHAUS v. BAKER**

[216 N.C. App. 59 (2011)]

*Id.* at 939.

Returning to the matter at bar, the trial court concluded in its ·order denying Ehrenhaus's motion for preliminary injunction that he failed to establish by clear and convincing evidence that the share exchange was coercive. In so ruling, the court noted there were "few (if any)" entities in position to offer a superior merger proposal, and that, in all likelihood, the federal government would not provide any financial assistance to Wachovia. Wells Fargo acquired only 40 percent of the Wachovia voting rights—nearly identical to the amount the GEPT effectively controlled in *In re IXC Communications, Inc. S'holder Litig.* As was the case in *Omnicare,* the Wachovia Board agreed to a fiduciary out provision.

The facts of this case fall between the two Delaware decisions, but the critical distinction between the matter at bar and *Omnicare* is that the merger protection measures here did not prevent the shareholders from voting down the Merger. In *Omnicare,* the shareholders in favor of the merger had already locked up enough votes to ensure the merger would succeed. The fiduciary out clause forced the NCS board to submit the proposed merger for a shareholder vote, even if a superior merger opportunity arose; and a superior merger opportunity did, in fact, come available. While there was a similar fiduciary out clause in the matter at bar, independent shareholders held 60 percent of the voting rights and there was very little chance the Wachovia Board would receive a comparable merger offer from a different suitor. Once the voting agreement and fiduciary out clause were in place in *Omnicare,* the board of directors could not protect the independent shareholders from being forced into an inferior transaction. In this case, on the other hand, *the independent shareholders could protect themselves.* We conclude that, under these facts, it is highly unlikely the Class would have prevailed on a breach of fiduciary duty claim alleging the Wachovia Board breached its fiduciary duty by approving a coercive share exchange.[8]

---

8. Delaware applies various standards of review to evaluate director conduct related to different types of transactions. *See* Thanos Panagopoulos, 3 Berkley Bus. L.J. 437 (2006). In *Omnicare,* the Delaware Supreme Court employed the *"Unocal"* standard of review, which places enhanced scrutiny on deal protection measures beyond that of the business judgment rule. 818 A.2d at 934. Nothing in our opinion should be construed as adopting a standard of review that varies from the business judgment rule; that issue is not before us. Rather, we contrast *Omnicare* with *In re IXC Communications, Inc. S'holder Litig.* to illustrate the considerations involved in determining whether deal protection measures are coercive.

**EHRENHAUS v. BAKER**

[216 N.C. App. 59 (2011)]

The amended complaint also alleged the "definitive Proxy Statement contain[ed] materially misleading statements and omissions" and that "[w]ithout material and accurate information, Wachovia's public shareholders c[ould not] make an informed judgment as to whether to vote for or against the Merger." We find the Delaware courts' articulation of the non-disclosure principle persuasive. We hold that North Carolina directors "are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action." *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992). Delaware has adopted a definition of the term "material" from a United States Supreme Court securities law decision:

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. This standard is fully consistent with *Mills [v. Elec. Auto-Lite Co.*, 396 U.S. 375, 90 S. Ct. 616, 24 L. Ed. 2d 593] general description of materiality as a requirement that "the defect have a significant *propensity* to affect the voting *process*." It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (alteration in original) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 48 L. Ed. 2d 757, 766 (1976)). We believe this is an appropriate standard, and our review indicates Ehrenhaus raised potentially meritorious claims related to the fiduciary duty to disclose material facts.

Ehrenhaus also claimed that Wells Fargo aided and abetted a breach of fiduciary duty by the Wachovia Board. First, it is unclear whether such a cause of action exists in North Carolina. *In re Bostic Constr., Inc.*, 435 B.R. 46, 66 (Bankr. M.D.N.C. 2010) ("It is not even clear that North Carolina recognizes a cause of action for aiding and abetting breach of fiduciary duty."); *Battleground Veterinary Hosp., P.C. v. McGeough*, No. 05 CVS 18918, slip op. at 7 (N.C. Super. Ct. Oct.

19, 2007) ("It remains an open question whether North Carolina law recognizes a claim for aiding and abetting breach of fiduciary duty."). *Compare Ahmed v. Porter*, 1:09CV101, 2009 WL 2581615 (W.D.N.C. June 23, 2009) (unpublished) (concluding North Carolina recognizes such a claim), *with Laws v. Priority Tr. Servs. of N.C., L.L.C.*, 610 F. Supp. 2d 528, 532 (W.D.N.C. 2009) (concluding North Carolina does not recognize such a claim). This Court recognized an aiding and abetting theory of liability for federal securities laws violations in *Blow v. Shaugnessy*, 88 N.C. App. 484, 490, 364 S.E.2d 444, 447 (1988). However, the underlying rationale of that decision was abrogated by *Cent. Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 128 L. Ed. 2d 119 (1994). *Laws*, 610 F. Supp. 2d at 532. We elect not to delve into whether such a claim exists because it is highly unlikely Ehrenhaus or another Class member could establish a primary fiduciary duty violation by the Wachovia Board. *See Blow*, 88 N.C. App. at 489, 364 S.E.2d at 447 (aiding and abetting theory required "a securities law violation"); *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1039 (Del. Ch. 2006) (Delaware claim requires the fiduciary to breach his fiduciary duty and the non-fiduciary to participate knowingly in that breach). Because Ehrenhaus would have had a difficult time establishing the Wachovia Board breached its fiduciary duties, it would have been very difficult to establish Wells Fargo aided and abetted in a breach of fiduciary duty (assuming such a claim exists in this state).

The class action also sought relief on the basis that the tail provision—which provided the shares issued to Wells Fargo could not be redeemed by Wachovia for eighteen months following the shareholder vote on the Merger agreement, even if the Merger was not consummated—constituted a breach of fiduciary duty. The trial court agreed, enjoining the tail provision. Ultimately, the tail provision was eliminated from the share exchange, so the Class had no chance of prevailing on this claim.

In addition to negating the tail, Ehrenhaus was successful in securing disclosures by the Wachovia Board that aided shareholders in making an informed vote on the Merger. As the trial court found, the Settlement largely remedied the disclosure deficiencies alleged in Ehrenhaus's amended complaint. These disclosures included information concerning communications with potential suitors, communications with regulatory authorities prior to the Wachovia Board's vote on the Merger, and some of the methodologies utilized by Wachovia's financial advisors in evaluating the Merger. The trial court noted the

Settlement did not require disclosure concerning a tax benefit to which Wells Fargo might be entitled as a result of the Merger. As we note above, however, we fail to see how information concerning tax benefits obtained by Wells Fargo would have been a critical piece of information for shareholders. In sum, the additional disclosures made by Wachovia pursuant to the Settlement largely alleviated the issues raised by the most meritorious part of Ehrenhaus's allegations.

### 2. *Other claims released by the Settlement*

[6] The Released Claims include all causes of action against Defendants-appellees arising under Ehrenhaus's complaint as well as any claims related to:

> (i) the Merger, the Merger Agreement, the Share Exchange Agreement or any amendment thereto; (ii) the fiduciary obligations of any of the Defendants in connection with the Merger, the Merger Agreement, and the Share Exchange Agreement; (iii) any discussions or negotiations in connection with the Merger, or Merger Agreement, the Share Exchange Agreement, or any amendment thereto; (iv) the issuance and terms of the Series M Shares; (v) the amendment to Wachovia's articles of incorporation with respect to the issuance of the Series M Shares; (vi) the Proxy Statement or any amendment or supplement thereto; and (vii) the disclosure obligations of any of the Defendants in connection with the Merger, the Merger Agreement, the Share Exchange Agreement, and any discussions or conduct preparatory thereto . . . .

Initially, the Proposed Settlement excluded the following from the Released Claims: "(i) the right of the Plaintiff or any members of the Class to enforce in the Court the terms of the Stipulation; or (ii) the claims asserted by plaintiffs in the Amended Class Action Complaint for Violations of the Federal Securities Laws, dated December 15, 2008, in *Lipetz v. Wachovia Corp. et al.*, Civil Action No. 08-6171 (RJS) (S.D.N.Y.)." The Settlement was modified to exclude the following from the Released Claims:

> (iii) the claims asserted by plaintiffs in the Consolidated Class Action Complaint filed on September 4, 2009 in *In Re Wachovia Preferred Securities and Bond/Notes Litigation*, Master File No. 09 Civ 6351 (RJS) (S.D.N.Y.); (iv) claims not arising out of either the Merger or events involving the negotiation of, terms of and disclosures related to the Merger, (v) claims that arise from Wachovia's business or the Defendants'/Released Persons' acts or

omissions before or after the Class period; (vi) claims arising from alleged mismanagement, misconduct, misrepresentations, or non-disclosures about Wachovia's business and/or its securities during the Class period unrelated to the Merger; (vii) claims relating to the decline in value of Wachovia's share price before the Class period, or (viii) claims relating to the decline in value of Wachovia's share price during the Class period to the extent that such claims either arise from events, acts, or omissions that preceded the Class period or do not arise from the Merger.

Notably, claims seeking relief based on a decrease in Wachovia's share price due to Wachovia's acquisition of Golden West fall into at least one of the categories of additional exclusions from the Released Claims.

However, the exclusions from the Released Claims do not cover claims for damages related to un-alleged claims concerning the inadequacy of the Merger consideration. While Objectors-appellants failed to explain specifically what type of claim they wish to pursue, we note here that any action against the Wachovia Board would have little, if any, chance of success.

This type of lawsuit must hurdle the business judgment rule, which creates a strong presumption that the Wachovia Board acted with due care. A plaintiff may defeat this presumption only by demonstrating the Wachovia Board's conduct "cannot be attributed to any rational business purpose." *Hammonds*, 178 N.C. App. at 20–21, 631 S.E.2d at 13. Given the time demands and tumultuous market conditions, the business judgment rule is likely insurmountable in this case.

After the FDIC notified Wachovia that the FDIC intended to exercise its authority to conduct a forced sale of Wachovia to another financial institution, the Wachovia Board was under pressure to work out a deal with Citigroup or Wells Fargo. These were the only two potential suitors; the FDIC had rejected a deal that would have given the regulatory body an equity stake in Wachovia.

Wells Fargo offered more monetary consideration per share than Citigroup. And unlike Citigroup's offer, the proposal from Wells Fargo did not contain a material adverse change provision that would have allowed the acquiring institution to walk away from the deal if Wachovia experienced a material decline in value between signing the merger agreement and consummating it. Wachovia was successful in negotiating some concessions from Wells Fargo. Initially, Wells Fargo sought, through the share exchange, 50 percent of the voting power on the Merger. Wachovia negotiated the percentage down to 39.9 percent.

The Wachovia Board's advisors, Perella Weinberg and Goldman Sachs, uniformly advised against attempting to negotiate for superior terms in light of the time constraints imposed by the market and the FDIC. A director is entitled to rely on the advice of "[l]egal counsel, public accountants, or other persons as to matters the director reasonably believes are within their professional or expert competence." N.C. Gen. Stat. § 55-8-30(b)(2) (2009). The director loses that protection, however, "if he has actual knowledge concerning the matter in question that makes reliance" unwarranted. N.C. Gen. Stat. § 55-8-30(c) (2009). We note that in this case, a large portion of both financial advisors' fees were contingent on the success of the merger with Wells Fargo. While the Wachovia Board should have tempered its reliance accordingly—and nothing suggests the Board did not—we believe Perella Weinberg's and Goldman Sachs' advice indicates the Board's conduct was reasonable under the circumstances.

**[7]** *3. The reaction of the Class, recommendations of counsel, and notice adequacy*

There were over 150,000 Wachovia shareholders and over two billion shares of stock. The trial court received over 200 letters and emails regarding this case and remarked that much of that correspondence was directed to issues that were not before the court. Counsel indicated they received hundreds of calls from individuals unhappy with the Settlement, but there are only two remaining objectors in this case: Mr. Robinson and Mr. Loughridge. "In the class action context, silence may be construed as assent." *In re GNC S'holder Litig.: All Actions*, 668 F. Supp. 450, 451 (W.D. Pa. 1987). Provided there has been adequate notice of the terms of a settlement, a dearth of objections may indicate a settlement is fair. *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 425 (S.D.N.Y. 2001). The trial court viewed the reaction of the Class as "muted," which supported a finding that the Settlement is fair, reasonable, and adequate. The trial court was in the best position to determine whether the public outcry over the Settlement raised fairness concerns grounded in law. Furthermore, given the unlikely prospect of success on any of the claims in this case, even if the trial court underestimated the legitimate complaints of Class members, the court's appraisal of the Class reaction did not rise to the level of an abuse of discretion.

**[8]** The trial court also based its decision on the recommendations of counsel. The trial court specifically found that Ehrenhaus's attorneys are "highly respected and experienced in shareholder class action litigation." The court agreed with both plaintiff and defense counsel

that the Settlement is a "reasonable compromise given the uncertain value of the remaining claims and the expense and delay that would result from further litigation." "[T]he opinion of experienced and informed counsel is entitled to considerable weight." *Id.* at 430. At the Settlement approval hearing, the trial court inquired as to why the discovery confirmed the reasonableness of the Settlement. Ehrenhaus's counsel replied that, based on the depositions of executives involved in the case, "there were pieces here and there that . . . were favorable to [Ehrenhaus's] position, but overall it wasn't even close."

Our review also indicates the parties employed proper procedures for providing notice to absent Class members. The trial court required Wells Fargo to mail notice of the Proposed Settlement to Class members on or before 24 May 2009 at the last address appearing in Wachovia's stock transfer records. The notice instructed record owners of stock who were not also the beneficial holders to forward the notice to the beneficial holders. Wells Fargo employed Georgeson, Inc., a proxy solicitation firm, to distribute the notice. Georgeson, Inc., distributed the notice to the required recipients on 22 May 2009. The firm also contacted over 450 banks, brokers, and other intermediaries that might have held shares on behalf of beneficial owners of Wachovia stock. Over one million copies of the notice were distributed to Class members. Our review indicates the contents of the notice adequately apprised Class members of the Proposed Settlement and Settlement hearing.

### 4. *Attorneys' Fees*

**[9]** In their factual analysis, Objectors-appellants state, "In the Court's 5 February 2010 Order, the fact that the [sic] Ehrenhaus's counsel had a contingency fee agreement was revealed for the first time and yet a fee was allowed by the Court despite no award to the shareholders." Their contentions are that the Settlement was negotiated prior to any hearing on the adequacy of Class counsel and an agreement that Class counsel was to be paid "$2 million by the [Defendants-appellees] and the shareholders were to receive nothing." Objectors-appellants further contend that, "[f]rom the date of the settlement (17 December 2008) there was a direct conflict of interest between the attorneys and their clients, the shareholders, forward. The attorneys for the shareholders have refused to talk with Appellants or correspond with them in any way concerning the facts of the case." Furthermore, Objectors-appellants contend, "Ehrenhaus'[s] attorneys were to be paid, by agreement, almost $2,000,000 by Wells Fargo. The Court finally approved a fee of $900,000 plus expenses.

There is no evidence as to what the attorneys or Ehrenhaus have actually received or been promised." The Objectors-appellants contend that the trial court did not perform the "rigorous" analysis required under Rule 23.

North Carolina follows the American Rule with regard to award of attorney's fees. In *Stillwell Enterprises, Inc. v. Interstate Equipment Co.*, our Supreme Court opined as follows:

> As was stated by Chief Judge (now Justice) Brock in *Supply, Inc. v. Allen,* "[t]he jurisprudence of North Carolina traditionally has frowned upon contractual obligations for attorney's fees as part of the costs of an action." Certainly in the absence of any contractual agreement allocating the costs of future litigation, it is well established that the non-allowance of counsel fees has prevailed as the policy of this state at least since 1879. Thus the general rule has long obtained that a successful litigant may not recover attorneys' fees, whether as costs or as an item of damages, unless such a recovery is expressly authorized by statute. Even in the face of a carefully drafted contractual provision indemnifying a party for such attorneys' fees as may be necessitated by a successful action on the contract itself, our courts have consistently refused to sustain such an award absent statutory authority therefor.

300 N.C. 286, 289, 266 S.E.2d 812, 814–15 (1980) (citations omitted).

There are, however, certain exceptions to this rule. One such exception, which applies in North Carolina, is the "common fund doctrine":

> [T]he rule is well established that a court of equity, or a court in the exercise of equitable jurisdiction, may in its discretion, and without statutory authorization, order an allowance for attorney fees to a litigant who at his own expense has maintained a successful suit for the preservation, protection, or increase of a common fund or of common property, or who has created at his own expense or brought into court a fund which others may share with him.

*Horner v. Chamber of Commerce*, 236 N.C. 96, 97–98, 72 S.E.2d 21, 22 (1952). When, as here, there is no common fund, courts in some jurisdictions can award attorney's fees under the "common benefit" doctrine.

The "common benefit doctrine" is another equitable exception to the American Rule. The Delaware Supreme Court explained the doctrine as follows:

> "[A] litigant who confers a common monetary benefit upon an ascertainable stockholder class is entitled to an award of counsel fees and expenses for its efforts in creating the benefit . . . . [T]o be entitled to an award of fees under the corporate benefit doctrine, an applicant must show . . . that:
>
> (1) the suit was meritorious when filed;
>
> (2) the action producing benefit to the corporation was taken by the defendants before a judicial resolution was achieved; and
>
> (3) the resulting corporate benefit was causally related to the lawsuit."

*Cal-Maine Foods, Inc. v. Pyles*, 858 A.2d 927, 929 (Del. 2004) (quoting *United Vanguard Fund v. Takecare, Inc.*, 693 A.2d 1076, 1079 (Del. 1997)) (alterations in original).

The parties to this Settlement originally entered into a memorandum of understanding and a stipulation that, subject to court approval, settled all outstanding issues between the Class, Wachovia, the Wachovia Board, and Wells Fargo. The text of the stipulation reads as follows:

> As part of the terms and conditions of this Stipulation, Wells Fargo agrees to pay to Plaintiff's Counsel, for their efforts in achieving the benefits of the Settlement of this Action, the sum of $1.975 million, for their fees and litigation-related expenses, subject to Court approval of the Settlement contemplated by this Stipulation. Wells Fargo shall make payment to Wolf Popper LLP of the fees and expenses provided in this paragraph within five days of the Court's order approving the Settlement, subject to Plaintiff's Counsel's obligation to repay such amount as may become necessary should the Settlement not obtain Final Court Approval or the fees and expenses become reduced or modified on any appeal.

This stipulation was later modified so that the trial court had to determine the final amount of the fees to be awarded and the parties agree only to pay "up to" $1.975 million. The court further found that Plaintiff's counsel did not submit time records detailing the work done on the case. Furthermore, the lodestar calculation as submitted

by counsel requested an award of $1,325,168.50 in fees and $32,621.98 in expenses.

We read the procedure as adopted by the trial court as the functional equivalent of requiring the court to make an award of attorney's fees. This case does not involve a settlement expressly dependent upon payment of a liquidated amount of attorney's fees. However, here the court was asked to award a fee and not approve a fee agreed to by the parties. While any "compromise" in a class action must be reviewed by a court, a court cannot modify a purely contractual settlement. *See Cabarrus Cty. v. Systel Bus. Equip. Co.,* 171 N.C. App. 423, 425, 614 S.E.2d 596, 597 (2005) (stating settlements are interpreted according to "general principles of contract law); *Cherry, Bekaert & Holland v. Worsham,* 81 N.C. App. 116, 120, 344 S.E.2d 97, 100 (1986) (stating that courts cannot rewrite the plain language of a contract).

Regrettably, we are unable to adequately review the decision of the trial court for lack of complete findings of fact and conclusions of law on the issue of attorney's fees. For the following reasons, we vacate that portion of the court's order regarding attorney's fees and remand the matter for additional findings of fact and conclusions of law. The reasonableness of attorney's fees in this state is governed by the factors found in Rule 1.5 of the Revised Rules of Professional Conduct of the North Carolina State Bar.

(a) A lawyer shall not make an agreement for, charge, or collect an illegal or clearly excessive fee or charge or collect a clearly excessive amount for expenses. The factors to be considered in determining whether a fee is clearly excessive include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

(b) When the lawyer has not regularly represented the client, the scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation.

(c) A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by paragraph (d) or other law. A contingent fee agreement shall be in a writing signed by the client and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal; litigation and other expenses to be deducted from the recovery; and whether such expenses are to be deducted before or after the contingent fee is calculated. The agreement must clearly notify the client of any expenses for which the client will be liable whether or not the client is the prevailing party. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter and, if there is a recovery, showing the remittance to the client and the method of its determination.

(d) A lawyer shall not enter into an arrangement for, charge, or collect:

. . . .

(2) a contingent fee in a civil case in which such a fee is prohibited by law.

(e) A division of a fee between lawyers who are not in the same firm may be made only if:

(1) the division is in proportion to the services performed by each lawyer or each lawyer assumes joint responsibility for the representation;

(2) the client agrees to the arrangement, including the share each lawyer will receive, and the agreement is confirmed in writing; and

(3) the total fee is reasonable.

N.C. Rev. R. Prof. Conduct 1.5 (2011).

At the fairness hearing, Class counsel and the Class representative announced that the fee agreement they had negotiated was a "contingent" fee. Without the written agreement of the parties, as required by Rule 1.5, as to their agreed-upon compensation, it would be problematic for the Court to determine what amount would be reasonable.

Second, the decision of the court fails to make any allowance for an award to North Carolina local counsel. Clearly both the local and Class counsel participated in the results obtained and the award, if any, should consider both firms' efforts. Furthermore, Rule 1.5(e)(2) provides that the client must agree to any fee sharing agreement in writing. *Id.* The record contains no such agreement.

Next, the attorneys did not present contemporaneous records showing the number of hours expended and the hourly rates for the attorneys charged. It would be difficult for the Court to draw a conclusion of what amount of time Class counsel spent litigating compensable matters without such records. Furthermore, although the Court may take judicial notice of these efforts, some evidence must be presented from a witness that the fee sought would be that which is customarily charged in the locality for similar legal services.

Rule 1.5(e) also provides that a contingency fee cannot be charged in a civil case in which such a fee is prohibited by law. Because the trial court did not examine the contingency fee nature of the written agreement, we cannot know the legal basis upon which the parties agreed to the contingency. In *In re Wachovia S'holder Litig.*, the trial court awarded attorney's fees using the common benefit doctrine and urged the appellate courts of this state adopt this exception to the American Rule. *See* 2003 NCBC 10 ¶74 (N.C. Super. Ct. Dec. 19, 2004) (unpublished), *rev'd, In re Wachovia S'holder Litig.*, 168 N.C. App. 135, 607 S.E.2d 48 (2005). However, this Court specifically rejected the common benefit theory as an exception to the American Rule in this state. *In re Wachovia Shareholders Litig.*, 168 N.C. App. at 140, 607 S.E.2d at 51.[9] We view the resolution of this issue as central to the question of whether there is any evidence of a settlement. While we presume good faith on the part of all counsel

---

9. The trial court cited *In re Wachovia Shareholders Litig.*, 2003 NCBC 10, but it is unclear whether that opinion formed the basis for the trial court's decision to award attorney's fees in this case.

EHRENHAUS v. BAKER

[216 N.C. App. 59 (2011)]

admitted to practice, the shareholders had a right to adequate disclosure of information on this issue since they are being asked to pay a portion of the fees and a fiduciary relationship exists.

While the trial court's analysis did partially complete its task, it did not finish the task of reviewing the necessary evidence to make its decision. On remand, we trust the trial court to examine additional evidence and to make the appropriate findings of fact and conclusions of law, including a reasoned decision on the issue of how it arrived at the figure to be awarded.

### D. Alleged Omission of Evidence from the Record and Refusal to Consider Material Evidence

**[10]** The heading of Objectors-appellants' brief states that "the trial court erred in omitting from the record and failing to consider material evidence in approving the settlement." (Capitalization omitted). The body of this section fails to support this argument with even a single citation to legal authority, violating the Rules of Appellate Procedure. N.C.R. App. P. 28(b)(6) ("The body of the argument . . . shall contain citations of the authorities upon which the appellant relies."); *cf. Hatcher v. Harrah's NC Casino Co.*, 169 N.C. App. 151, 159, 610 S.E.2d 210, 214–15 (2005) ("[P]laintiff fails to cite any legal authority in support of his position. Accordingly, we conclude that this issue does not warrant appellate review, and we dismiss this assignment of error."). Furthermore, Objectors-appellants fail to explain what legal principle would entitle them to relief on appeal. This argument is without merit.

## IV. Conclusion

For the foregoing reasons, the ruling of the trial court is

Affirmed in part and Reversed in part.

Judges CALABRIA and STROUD concur.